# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARON G. GEMMER AND** | : | **CIVIL ACTION** |
| **LYDIA S. GEMMER,** | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| **SURREY SERVICES FOR** | : | |
| **SENIORS, INC.** | : | **No. 10-810** |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **September 7, 2010**

This case arises under the Lanham Act, Act, 15 U.S.C. § 1051 *et seq*. Plaintiffs Baron and Lydia Gemmer ("Plaintiffs") initiated this litigation on February 24, 2010, filing a Complaint against Defendant Surrey Services for Seniors ("Surrey"). (Doc. No. 1). In their Complaint, Plaintiffs allege Trademark Infringement and Unfair Competition under 15 U.S.C. § 1125(a), Unfair Methods of Competition and Unfair Acts under 73 P.S. § 201-2, and Pennsylvania Common Law Unfair Competition. *See Id.* at Counts 1-3. On March 26, 2010, Plaintiffs filed a Motion for a Preliminary Injunction to enjoin Defendant from, *inter alia*, using the trademark "The Main Line Antiques Show." (Doc. No. 5). On March 30, 2010, Defendant filed an Answer, denying Plaintiffs' claims, and asserting seventeen Affirmative Defenses. (Doc. No. 9). Defendant further filed Counterclaims against Plaintiffs. *Id.* On April 9, 2010, Defendant filed both a Response in Opposition to Plaintiffs' Motion for Preliminary Injunction and a Counter Motion for Preliminary Injunction, seeking to enjoin Plaintiffs from using the trademark "The Main Line Antiques Show." (Doc. No. 14).

On June 14, 2010, the Honorable C. Darnell Jones referred the case to me for a Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction and Defendant's Counter Motion for Preliminary Injunction. (Doc. No. 36). I conducted an evidentiary hearing on June 30, July 1, 2, and July 13, 14, and 16, 2010. The parties have submitted proposed findings of fact and conclusions of law. (Doc. Nos. 57, 58).

I.      **FINDINGS OF FACT**

A.      **Background**

1.      Plaintiffs, Baron G. Gemmer and Lydia S. Gemmer, are a married couple who reside at 335 South Wayne Avenue, Wayne, PA 19087. Complaint at ¶ 15.

2.      The Gemmers have a history of volunteering for numerous charitable causes, including serving as docents at Lemon Hill, acting as neighborhood solicitation designees for various charities (including the American Heart Association and the American Diabetes Association), planning charitable events, and volunteering for various animal-related charitable organizations. Declaration of L. Gemmer. at ¶¶ 4-5.

3.      Ms. Gemmer has a background in working with seniors. N.T. 6/30/10, L. Gemmer at 31. She has a master's degree in health services administration, focusing on long term care, and has worked in nursing homes, continuing care retirement communities, and senior home care. L. Gemmer Testimony, N.T. 6/30/10 at 33.

4.      Defendant, Surrey Services for Seniors, Inc., ("Surrey") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 28 Bridge Avenue, Berwyn, PA 19312. Complaint at ¶ 16.

5.     Surrey was founded twenty nine years ago by Ms. Jeanne LaRouche.  Surrey provides low cost services for the elderly, helping them to live independently.  LaRouche Testimony, N.T. 7/1/10 at 115-116.

6.     Surrey is a volunteer-based, professionally-staffed organization helping seniors to remain in their homes with independence and dignity and to continue as active members of the community.  Fentress Testimony, N.T. 7/14/10 at 16.   In 2009, Surrey had approximately five hundred volunteers.  LaRouche Testimony, N.T. 7/1/10 at 115-116.

7.     Surrey has approximately 7 full time employees and 5 part time employees in-house.  LaRouche Testimony, N.T. 7/2/10 at 116.  In addition, Surrey has between 90-110 caregivers in the homecare department, and six to eight drivers.  LaRouche Testimony, N.T. 7/2/10 at 116.

8.     Surrey generally holds three annual special fundraising events: the chairman's reception, the spring gala, and - from 2006 through 2009 - The Main Line Antiques Show.  In the past, Surrey has held other special events, including a bazaar and Appraisal Fest and Silent Auction.  LaRouche Testimony, N.T. 7/1/10 at 118-119; 2003-2004 Surrey Event Advertisements (Defendant's Ex. 1- 3) .

**B.     Beginning of Parties' Relationship**

9.     On February 28, 2005, Ms. Gemmer filled out a Surrey Volunteer Application form, stating her interest in volunteering for Surrey, including development and special events committees.  L. Gemmer Testimony, N.T. 6/30/10 at 146;  L. Gemmer Volunteer Application (Defendant's Ex. 4).

10.     In March 2005, Ms. Gemmer met with Surrey founder and then-President Jeanne LaRouche to discuss volunteer opportunities at Surrey.  L. Gemmer Testimony, N.T. 6/30/10 at 31, 33; LaRouche Testimony, N.T. 7/2/10 at 35.

11.     Ms. LaRouche's reaction was "very positive," and Ms. LaRouche suggested that Ms. Gemmer meet Dorian Wells, Surrey's Director of Development.  L. Gemmer Testimony, N.T. 6/30/10 at 34.

12.     In the spring of 2005, Ms. Gemmer met with Surrey Director of Development, Dorian Wells, to discuss organizing a Fall Fund Raiser for Surrey.  L. Gemmer Testimony, N.T. 6/30/10 at 147, 150-52; L. Gemmer E-mail (Defendant's Ex. 5, 195).

13.     Ms. Gemmer informed Mr. Wells that she was interested in running an event to benefit Surrey.  L. Gemmer Testimony, N.T. 6/30/10 at 34.  During the meeting, it was agreed that Surrey would recruit and supply the volunteers for the event and Ms. Gemmer would organize it.  *Id*. at 35 - 36.

### C.     Relationship Between Surrey and "Volunteers"

14.     Surrey does not "control"its volunteers.  Second Fentress Declaration at 4 (Defendant's Ex. 204).

15.     Surrey places a high degree of trust in its volunteers' abilities and good intentions, and relies on the volunteers to conduct themselves in an appropriate manner.  *Id.* at 4-5.

16.     Surrey does not review the performance of its volunteers "because they were/are volunteers, not employees."  *Id.* at  3.

17.     Surrey did not require volunteers working on "special events" like The Main Line Antiques Show to fill out a volunteer application, or review a volunteer handbook.  *Id.* at 2.

18.     Although Ms. Gemmer did fill out a volunteer application, Baron Gemmer never filled out a volunteer application.  B. Gemmer Testimony, N.T. 7/1/10 at 56.

19.     When Ms. Gemmer came to Surrey in March, 2005 and offered to chair a special event, she was not an employee of Surrey.  LaRouche Testimony, N.T. 7/2/10 at 63.  However, Ms. Gemmer later worked part time at Surrey, and was a paid Surrey employee for nearly two years.  From July 11, 2006 through September 22, 2006, Ms. Gemmer served as Surrey's acting Director of Development.  From September 25, 2006 to June 23, 2008, Ms. Gemmer served as Surrey's Grants Manager.  *Id.* at 63 - 64;  Declaration of Lydia Gemmer in Support of Plaintiffs' Opposition to Defendant's Motion for Preliminary Injunction, at  43.

**D.     Fall  Fundraiser**

20.     Initially, in 2005, the fall fundraiser organized and chaired by Ms. Gemmer was an antiques "Appraisal Fest."  L. Gemmer E-mail (Defendant's Ex. 5).

21.     On May 24, 2005, Ms. Gemmer emailed Ms. LaRouche and Mr. Wells an Excel spreadsheet with a "to do" list for the fundraiser, identifying one of the next steps as "develop[ing] committee to work on fundraiser."  L. Gemmer Email and Attachments (Defendant's Ex. 6).

22.      In July, 2005, Surrey's fall fundraising committee held their first meeting.  The planned fall fundraising event was entitled *Surrey's First Annual Antique Appraisal Fest and Silent Auction ("Appraisal Fest")*.  The meeting agenda identified the *First Annual Antique Appraisal Fest and Silent Auction* as a Surrey Fall Fund Raising special event.  Memorandum and Meeting Agenda (Defendant's Ex. 8).

23.     Before the committee meeting, Ms. Gemmer prepared a packet of planning information, including draft sponsor documents.  *Id.*

24.     Surrey's initial sponsorship letter sent out by the fall fundraiser committee invited sponsors to participate in Surrey's *First Annual Appraisal Fest and Silent Auction*.  Ms. LaRouche, President of Surrey, and Ms. Gemmer, Chairperson of the Committee, signed the letters.  The Sponsorship agreements were for Surrey Services for Seniors' *Antique Appraisal Fest and Silent Auction*.  The acknowledgment letters to the sponsors stated that the sponsors are partnering with Surrey, and the checks should be made out to Surrey.  *Id.*

25.     As chair of the event, Ms. Gemmer drafted the event timeline, volunteer tasks, budget, sponsor letters and materials, and thank you letters.  L. Gemmer Testimony, N.T. 6/20/10 at 36 - 37.  She coordinated a pre-event sponsor party, solicited and selected an event speaker, solicited and secured volunteer appraisers, developed appraiser guidelines, arranged for food, and organized a silent auction and a "fabulous finds" table.  *Id.*

26.     Mr. Gemmer assisted his wife in preparing for the event by visiting the venue and arranging event logistics.  Mr. Gemmer performed event set-up tasks, such as taping wires down, rearranging the tables, and setting up signage for the Appraisal Fest.  B. Gemmer Testimony, N.T. 7/1/10 at 6.

27.     The *Appraisal Fest* thank you letters to event sponsors were sent out on Surrey letterhead, with Surrey's trademark and logo at the top of the letter.  The letters directed the sponsors to direct any telephone inquires to Dorian Wells, Director of Development and Marketing at Surrey.  The letters were signed by Ms. Gemmer as Chairperson of the *Appraisal Fest* Committee.  Sponsorship Thank You Letter (Defendant's Ex. 16).

28.     Surrey also sent out press releases, announcing that "Surrey Services for Seniors is pleased to announce its First Annual Appraisal Fest and Silent Auction." Appraisal Fest and Silent Auction Press Release (Defendant's Ex. 19)

29.     The Appraisal Fest was considered a successful event, but the committee was unsure if the event should continue.  L. Gemmer Testimony, N.T. 6/30/10 at 163 - 165.

30.     Ms. Gemmer, as Chairperson for the event, sent evaluation forms to the committee members to gauge their feeling on continuing the event. Ms. LaRouche and Nick Vandekar, a Surrey volunteer, returned the evaluation, stating "yes, the event was worth continuing and yes,  they would be interested  in remaining on the committee."  L. Gemmer Testimony, N.T. 6/30/10 at 164-165; Jeanne LaRouche Email (Defendant's Ex. 22), Nick Vandekar Email (Defendant's Ex. 23)

31.     During the December 2005 wrap-up meeting for Appraisal Fest, the fall fundraiser committee and Surrey staff began to discuss and plan the next fall fundraiser.  L. Gemmer Testimony, N.T. 6/30/10 at 166, 168; Jeanne LaRouche Emails (Defendant's Ex. 25), Declaration of Krista Freidrich (Defendant's Ex. 181); Declaration of Roberta Hollingshead (Defendant's Ex. 201).  Ms. Hollingshead, an antiques dealer and Surrey volunteer who served as an appraiser at the event, suggested to Ms. Gemmer that the event change from an "Appraisal Fest" to an antiques show.  Declaration of Roberta Hollingshead (Defendant's Ex. 201); L. Gemmer Testimony, N.T. 6/30/10 at 39.

32.     Ms. Gemmer met with Ms. Hollingshead at Ms. Gemmer's house in January 2006 to discuss her suggestion to hold an antiques show as Surrey's fall fundraising event.  L. Gemmer Testimony, N.T. 6/30/10 at 39 - 40.  After gathering more information, Ms. Hollingshead's

suggestion that Surrey's fall fundraiser be an antiques show was accepted.  *Id.*

33.     In early 2006, Ms. Hollingshead and Nicholas Vandekar, Surrey volunteers with histories as antiques dealers and appraisers at Appraisal Fest, joined the volunteer committee for Surrey's fall fundraiser.  Declaration of Roberta Hollingshead (Defendant's Ex. 201); Deposition of Nicholas Vandekar at 20 - 21 (Plaintiffs' Ex. 55).

34.     Surrey's volunteer committee members and staff began to look for a venue to hold the 2006 fall fundraiser.  L. Gemmer Testimony, N.T. 6/30/10 at 169.

35.     The Gemmers, accompanied at times by other volunteers, investigated many potential locations on the Main Line for the antiques show, and eventually decided on the Valley Forge Military Academy and College ("VFMA").  L. Gemmer Testimony, N.T. 6/30/10 at 43, 45; B. Gemmer Testimony, N.T. 7/1/10 at 7;  LaRouche Testimony, N.T. 7/2/10 at 83.

36.     In April 2006, Maude Walker, a long time Surrey volunteer and supporter, provided $2,500.00 to pay the initial deposit for the rental of the VFMA venue for the fall fundraiser.  LaRouche Testimony, N.T. 7/1/10 at 131-132; New York Community Trust Check (Defendant's Ex. 29).  The check was sent to Mr. Wells of Surrey, and the check was made out to Surrey Services for Seniors, attention Jeanne LaRouche, President.  L. Gemmer Testimony, N.T. 6/30/10 at 174-77; New York Community Trust Check (Defendant's Ex. 29).

37.     On April 25, 2006, VFMA sent their facility rental agreement to the attention of Surrey employee Krista Friedrich.  L. Gemmer Testimony, N.T. 6/30/10 at 177; Letter and VFMA Contract (Defendant's Ex. 30).

38.     On April 27, 2006, Ms. LaRouche forwarded information regarding the VFMA contract, along with the proposed contract for antique dealers, to Ms. Barbara Fentress in Surrey's

financial department for her review.  L. Gemmer Testimony, N.T. 6/30/10 at 180-181; Jeanne

LaRouche Email and Exhibitors Contract (Defendant's Ex.31).

39.    The facility rental agreement was between VFMA and Surrey.  The rental

agreement was signed on behalf of Surrey by Jeanne LaRouche, President of Surrey.  Krista

Friedrich also signed the contract as a representative for Surrey.  L. Gemmer Testimony,  N.T.

6/30/10 at 178-79; Letter and VFMA Contract (Defendant's Ex. 30).

40.    The full payment for the venue rental had to be paid by Surrey prior to the Show.

Fentress Testimony, N.T. 7/13/10 at 77-80; Surrey QuickReport, The Main Line Antiques Show

2006 (Defendant's Ex. 219).

41.    The 2006 Exhibitors'/Dealers' contract was entitled "Exhibitor's Contract - Surrey

Services for Seniors Antique Show."  Surrey Services for Seniors Antique Show Contract

(Defendant's Ex. 33).  The contract is between the dealers and Surrey.  The "Important

Information" bullet points identify the terms and conditions of the contract between Surrey and

the dealers.  The check from the Exhibitors were required to be made out to Surrey.  Any

questions regarding the contract would be directed to Surrey's fall fundraising committee

Chairperson or Surrey's volunteer and committee advisor for the fall fundraising committee, Ms.

Hollingshead.  L. Gemmer Testimony, N.T. 6/30/10 at 181 - 183; Jeanne LaRouche Email and

Exhibitors Contract  (Defendant's Ex. 31).

  **E. The Name "The Main Line Antiques Show"**

42.    The name "The Main Line Antiques Show" was created by Surrey's fall

fundraising committee.  The name evolved from the committee's original name, Surrey's Antique

Show.  LaRouche Testimony, N.T. 7/2/10 at 16, 19, 22-23.  Committee members discussed that

dealers and potential attendees would like to see a Main Line show re-instituted. Declaration of Maude Walker (Defendant's Ex. 191).

43.    Surrey's fall fundraising committee discussed numerous names for the fundraiser. The committee wanted to emphasize the geographic location of the show and the "cache" of having it on the Main Line.  The committee discussed The Philadelphia Antiques Show. Eventually, the name "evolved" into The Main Line Antique Show.  L. Gemmer Testimony, N.T. 6/30/10 at 46 - 47;  Vandekar Testimony, N. T. 7/13/10 at 20-21.

44.    Other Surrey volunteers similarly testified to having no clear recollection of the first time that the name "The Main Line Antiques Show" was used.  None could credit Ms. Gemmer as the person who first used the term.  Ms. LaRouche did not recall when the name "The Main Line Antiques Show" was first used, or who first suggested it.  *See* LaRouche Testimony, N. T. 7/2/10 at 17 - 19, 22; Hollingshead Deposition (Plaintiffs' Ex. 56 at 35 - 39); Fentress Testimony, N.T. 7/14/10 at 58; Krug Testimony,  N. T. 7/13/10 at 42.

45.    The fall fundraiser committee was aware that a show with a similar name had previously been held on the main line.  Ms. Hollingshead advised the committee that an antiques dealer named  Mancuso Brothers had at one time held a show entitled "*Main Line Classic Antiques Show*."   Ms. Hollingshead volunteered to contact Mancuso Brothers and confirm that there was no objection to Surrey using the name "The Main Line Antiques Show" for its fall fundraiser.  Roberta Hollingshead Declaration (Defendant's Ex. 201).

46.    Mancuso Brothers advised Ms. Hollingshead that they did not object to the use of the name "The Main Line Antiques Show."  *Id.*

### F.     The Main Line Antiques Show

47.     The early committee documents referred to the Show as Surrey Services for Seniors Antique Show.  LaRouche Testimony, N. T. 7/1/10 at 134-135, 140.

48.      The sponsor letters for the 2006 fall fundraiser stated, "Surrey is thrilled to be bringing a high quality antique show back to the Main Line."  Surrey invited potential sponsors to join in the excitement by sponsoring The Main Line Antiques Show.  The sponsorship letters were signed by Lydia Gemmer, the Chairperson of the Antique Show Committee, and Jeanne LaRouche, Surrey President.  The sponsor letter was sent out on Surrey stationary and in Surrey envelopes.  L. Gemmer Testimony, N.T. 6/30/10 at 187-189;  2006 Corporate Sponsor Letter (Defendant's Ex. 34), 2006 Individual Sponsor Letter (Defendant's Ex. 35).

49.     All of the meeting agendas for the 2006 fall fundraising committee identified the committee meetings as "Surrey Services for Seniors' Antique Show" meetings.  L. Gemmer Testimony, N.T. 6/30/10 at 190;  Antique Show Meeting Agenda (Defendant's Ex. 37).  The initial meeting agenda also stated that on the first day of the Show in November, Surrey would have access to the hall for set up.  Antique Show Meeting Agenda (Defendant's Ex. 37).

50.     The budget for The Main Line Antiques Show was part of Surrey's Development Department budget.  LaRouche Testimony N.T. 7/2/10 at 101-103.

51.     Surrey entered into the contracts with the Show's vendors.  Surrey contracted with vendors for their services at The Main Line Antiques Show.  Fentress Testimony, N.T. 7/13/10 at 80 - 81.  At some point, a private security company was retained to assist at the show.  Although Ms. Gemmer negotiated the contract with the security company, the contract for the Show was between Surrey and CIA Security and Patrol.  L. Gemmer Testimony, N.T. 6/30/10 at 214-215;

CIA Security & Patrol Contract (Defendant's Ex. 61).

52. Valley Press, Surrey's long time printer, provided *pro bono* services for The Main Line Antiques Show. Fentress Testimony, N.T. 7/14/10 at 70-71.

53. Ms. Gemmer routinely requested that Surrey reimburse her for expenses for The Main Line Antiques Show. Surrey never denied such an expense reimbursement request. Fentress Testimony, N.T. 7/14/10 at 10-12.

54. Surrey always obtained and paid for insurance for The Main Line Antiques Show. L. Gemmer Testimony, N.T. 6/30/10 at 235; Fundraiser/Special Event Questionnaire for Insurance Company (Defendant's Ex.106).

55. After the 2006 Show was held, Surrey's President, Jeanne LaRouche, reviewed drafts of follow-up thank you letters to the sponsors. The thank you letters to the sponsors were sent out on Surrey letterhead. L. Gemmer Testimony, N.T. 6/30/10 at 220 - 221; L. Gemmer Emails (Defendant's Ex. 69), Sponsor Thank You Letter (Defendant's Ex. 72).

56. Surrey paid and was responsible for all financial obligations associated with The Main Line Antiques Show. If the Show failed to make a profit, Surrey was responsible for the outstanding bills. LaRouche Testimony, N.T. 7/1/10 at 133, 138.

57. From the first "Main Line Antiques Show" in 2006 through the 2009 Show, neither party ever claimed to own the Show, control the Show, or control the name "The Main Line Antiques Show." Declaration of Krista Freidrich (Defendant's Ex. 181); Declaration of Dorothy Miller (Defendant's Ex. 189), Declaration of Mary Webb (Defendant's Ex. 190), Declaration of Barbara Wandersee (Defendant's Ex. 193).

58.     Surrey paid all of the expenses for The Main Line Antiques Show prior to the Show occurring in the fall each year.  Any profits from the prior year's Show were not carried over to pay for the following year's Show.  Any profits realized from the Show were placed in Surrey's general operating fund.  Fentress Testimony, N.T. 7/13/10 at 72-75;  N.T. 7/14/10 at 47, 50.

59.     The Show was held at VFMA from 2006 - 2009.  The facility rental contract was always between Surrey and VFMA.  LaRouche Testimony, N.T. 7/2/10 at 5.

60.     All of the expenses incurred to put on the Show have always been paid by Surrey.  LaRouche Testimony, N.T. 7/2/10 at 5.

61.     The Show has always relied upon the financial support of it's sponsors.  The Show sponsors have always been primarily Surrey board members, former board members, regular "big donors" and "friends of the family."  LaRouche Testimony, N.T. 7/2/10 at  5-7.

62.     From 2006 until the present, Surrey's paid employees have worked on the Show, both during work hours and on their own time.  LaRouche Testimony, N.T. 7/2/10 at  7-8.

63.     The Main Line Antiques Show committee meetings were held at Surrey's offices.  LaRouche Testimony, N.T. 7/2/10 at 7-8;  L. Gemmer Testimony, N.T. 6/30/10 at 229 - 230.

64.     In September 2007, the website (www.mlas.com) was created to advertise and provide information about the Show.  The Main Line Antiques Show's 2007 brochure specifically thanked Surrey volunteer Glen Barton for his service in designing the website.  2007 Main Line Antiques Show Brochure (Defendant's Ex.100);  L. Gemmer Testimony, N.T. 6/30/10 at 78, 96 - 97;  LaRouche Testimony, N.T. 7/2/10 at 8 - 9; B. Gemmer Testimony, N.T. 7/1/10 at 47;  MLAS Posters and Advertisements (Plaintiffs' Ex. 36).

65.     Mr. Gemmer registered the website in his name and owns the website.  B.

Gemmer Testimony, N.T. 7/1/10 at 49; LaRouche Testimony, N.T. 7/2/10 at 9, 96.

66.     The Gemmers never sought reimbursement from Surrey for costs associated with

the website. B. Gemmer, N.T. 7/1/10 at 50.

67.     The invoices for sponsors were on Surrey letterhead, and reflected sponsorship of

The Main Line Antiques Show.  All sponsorship checks were made payable to Surrey Services.

Any questions regarding the sponsorship invoice were to be sent to Lydia Gemmer, Chair Main

Line Antiques Show, c/o Surrey Services for Seniors.  Ms. Gemmer's Surrey work phone number

and work email address (lgemmer@surreyservices.org) are included on the sponsorship form.  L

Gemmer Testimony, N.T. 6/30/10 at 232 - 233;  Sponsor Letter (Defendant's Ex. 45, 59, 92).

68.     In 2008, The Main Line Antiques Show stylized trademark used for the Show's

advertisements included Surrey's logo, a lotus flower.  The advertisement also stated that more

information could be received by checking the Show's website or calling Surrey's offices in

Berwyn.  The brochures and Preview Party Invitations for the 2008 Show also incorporated

Surrey's logo as part of the name, The Main Line Antiques Show.  L. Gemmer Testimony, N.T.

6/30/10 at 240-41; Antiques Show - Booth Tours Pamphlet (Defendant's Ex.118); 2008 Brochure

(Defendant's Ex. 119), 2008 Antiques Show Preview Party RSVP (Defendant's Ex. 120).

69.     In 2008 and 2009, Surrey hired public relations consultants to market The Main

Line Antiques Show.  LaRouche Testimony, N.T. 7/2/10 at 10.

70.     In 2008, Tony DiCicco of the DiCicco Advertising Group was hired to perform

public relations consulting for The Main Line Antique Show.  L. Gemmer Testimony, N.T.

6/30/10 at 88 - 90; Fentress Testimony, N.T. 7/14/10 at 12 - 13;  Krug Testimony, N.T. 7/13/10

at 49 - 51

71.     Surrey paid Tony DiCicco's fees.  Fentress Testimony, N.T. 7/14/10 at 13.

72.     In 2009, Surrey hired Phoebe Resnick to perform public relations consulting for The Main Line Antique Show.  L. Gemmer Testimony, N.T. 6/30/10 at 90 - 94; Declaration of Phoebe Resnick (Defendant's Ex.196).  Ms. Resnick attested that she was hired by Surrey, worked for Surrey, and prepared all of her advertising plans for Surrey.  Ms. Resnick's fees were paid by Surrey.  Declaration of Phoebe Resnick (Defendant's Ex. 196).

73.     In 2009,  a PayPal account for The Main Line Antiques Show was established. The PayPal notice of the transaction states, "Hello Surrey Services for Seniors."  PayPal Website Page (Defendant's Ex. 159).  The bank account connected to the PayPal site was a Surrey bank account.  Surrey uploaded its Articles of Incorporation, IRS determination letter and Surrey's banking and checking account information to establish this account.  Fentress Testimony, N.T. 7/13/10 at 83 - 84.

74.     In 2009, temporary staffing for the Show was provided by Metropolitan. Metropolitan negotiated their staffing agreement with Ms. Gemmer, and the Gemmers assigned tasks to the staff.  However, Metropolitan's Invoice stated that they reported to Surrey Services for Seniors, and that the billing should be sent to Surrey Services for Seniors, attention, Barbara Fentress.  L. Gemmer, N.T. 6/30/10 at  270;  Metropolitan Invoice (Defendant's Ex.174).

75.     In September 2009, a Surrey volunteer, Dottie Miller, crated a Facebook page for The Main Line Antiques Show.  Ms. Miller is the administrator of the Facebook page.  B. Gemmer Testimony, N.T. 7/1/10 at 62-64, 92, 99; Declaration of Dorothy Miller (Defendant's Ex. 189).

76.     The 2006 Exhibitors'/Dealers' contract was entitled Exhibitor's Contract - Surrey Services for Seniors Antique Show.  Defendant's Ex. 33.  The contract was between the dealers and Surrey.  All of the bullet points listed under "important information" identify the terms of the contract between Surrey and the dealers.  The checks from the dealer/exhibitors were to be made out to Surrey.  Any questions regarding the contract were directed to Surrey's fall fundraising committee Chairperson or Surrey's volunteer and committee advisor for the fall fundraising committee, Ms. Hollingshead.  Exhibitors Contract (Defendant's Ex. 31).

77.     Eighty to ninety percent of the members of The Main Line Antiques Show committee from 2006-2009 were Surrey staff or long time volunteers.  Second Declaration of Barbara Fentress (Defendant's Ex. 204).

78.     A large majority of the sponsors for The Main Line Antiques Show were Surrey board members, past board members, and friends of Surrey.  Most of the monetary donations for the Show came from former benefactors of the Surrey organization.  LaRouche Testimony, N.T. 7/1/10 at 139, 140; Fentress Testimony, N.T. 7/14/10 at 4 - 8.

**G.     The Gemmer's Dedication to and Work On the Show.**

79.     Ms. Gemmer "oversaw" the work of The Main Line Antiques Show committee. LaRouche Testimony, N.T. 7/2/10 at 24; LaRouche Deposition (Plaintiffs' Ex. 54 at 199 - 200).

80.     Ms. Gemmer was not just another member of the committee; she was the very active, hands-on, and detail-oriented chairperson.  Hollingshead Deposition (Plaintiffs' Ex. 56 at 119 - 120).

81.     During the week of the 2006, 2007, and 2008 shows, Ms. Gemmer spent at least 80-100 hours working on show-related matters.  L. Gemmer Testimony, N.T. 6/30/10 at 76.

During the week of the 2009 show, she spent approximately 60-70 hours on the show.  *Id.*

82.　Mr. Gemmer spent approximately 75 hours on show-related tasks the week of the show.  B. Gemmer Testimony, N.T. 7/2/10 at 43.

83.　The Gemmer's collectively spent more than 5,000 hours of volunteer time on The Main Line Antiques Show from 2006-2009.  LaRouche Testimony, N.T. 7/2/10 at 65.

84.　Prior to each show, the Gemmer's went to VFMA to measure and tape out the space alloted for each dealers' booth.  L. Gemmer Testimony, N.T. 6/30/10 at 58; B. Gemmer Testimony, N.T. 7/1/10 at 39.

85.　The Gemmer's created the show's floor plan, and changed and updated the floor plan as the show expanded into additional rooms at the VFMA each year.  L. Gemmer Testimony, N.T. 6/30/10 at 59, 101; B. Gemmer Testimony, N.T. 7/1/10 at 40; 42; Antiques Show Layout (Plaintiffs' Ex. 41).

86.　Ms. Gemmer kept track of dealers' booth deposit payments.  Ms. Gemmer tracked and fulfilled the dealers' requirements for their individual booths.  Ms. Gemmer handled hotel arrangements for the dealers, invoiced the dealers for any remaining booth balances, and sent the dealers marketing materials.  L. Gemmer Testimony, N.T. 6/30/10 at 59.

87.　From 2006-2009, Mr. Gemmer supervised many of the Show's logistics, including the flow of pedestrians.  Mr. Gemmer also oversaw the Show's complex parking issues, including parking during dealer move-in, the preview party, the days of the show, and the dealers' move out.  L. Gemmer Testimony, N.T. 6/30/10 at 68; B. Gemmer Testimony, N.T. 7/2/10 at 39 - 40; Declaration of Barbara Fentress (Defendant's Ex. 203).

88.     Mr. Gemmer coordinated the electrical layout, ensuring that each booth had the required electrical power.  B. Gemmer Testimony,  N.T. 7/2/10 at 40.

89.     Ms. Gemmer decided whether a dealer could participate in the show.  Email from L. Gemmer to Roberta Hollingshead and Roz Gibbons (Plaintiffs'. Ex. 19).

90.     The Gemmer's spent about six days each year handling the logistics associated with the two-day show and the evening preview party, including setting up and dismantling the cases, tables, walls, electrical wiring, and dealer booths for the show.  L. Gemmer Testimony, N.T. 6/30/10 at 67.

91.     The Thursday before the event, the Gemmer's would handle onsite logistics, with some support from Mr. and Mrs. Hollingshead.  L. Gemmer Testimony, N.T. 6/30/10 at 68.

92.     Ms. Gemmer developed an advertising plan for each year's show.  L. Gemmer Testimony, N.T. 6/30/10 at 59 - 61.

93.     Ms. Gemmer created the budget for the show each year.  L. Gemmer Testimony, N.T. 6/30/10 at 64, 104 -105; Email from L. Gemmer to Jeanne LaRouche and Dorian Wells (Plaintiffs' Ex. 16); 2006, 2007, 2008, and 2009 Main Line Antiques Show Budget (Plaintiffs' Ex. 62, 63, 64 and 65).

94.     Ms. Gemmer reviewed and approved all show-related invoices.  LaRouche Deposition (Plaintiffs' Ex. 54 at 66).   Surrey paid all expenses related to The Main Line Antiques Show after Ms. Gemmer reviewed and approved the invoice.  Fentress Testimony, N.T. 7/14/10 at 13.

95.     Money was collected from ticket sales during the show via cash, check and credit card.  Each night, Ms. Gemmer would take the credit card machine and run the batch to send the

information to the credit card company, so Surrey could be credited with the sale. Ms. Gemmer would also take home the cash and receipts, and reconcile the receipts and payments before they were turned over to Surrey. B. Gemmer Testimony, N.T. 7/1/10 at 45.

96.     The credit card machines used at The Main Line Antiques Show were owned and provided by Surrey. L. Gemmer Testimony, N.T. 6/30/10 at 214, 236.

97.     Ms. Gemmer was the signatory on behalf of the Show to some of the Show's contracts, including the show's security contract in 2006 and the show's agreement with Main Line Today Magazine. Security Contract (Plaintiffs' Ex. 61); Main Line Today Agreement (Plaintiffs' Ex.20); LaRouche Testimony, N.T. 7/2/10 at 87.

98.     Ms. Gemmer signed the show's contracts with the Wayne Hotel and Radnor Hotel. Contracts (Plaintiffs' Ex. 82).

99.     Ms. Gemmer conducted "volunteer training" for the show each year at VFMA, and drafted outlines and task lists to instruct the show volunteers. L. Gemmer Testimony, N.T. 6/30/10 at 69, 102.

100.    Mr. Gemmer directed the shuttles and handled parking logistics during the days of the show. B. Gemmer Testimony, N.T. 7/1/10 at 41.

101.    Beginning in 2008, Mr. Gemmer supervised driveway and parking attendants from a temporary agency, Metropolitan Personnel, before and during the show. B. Gemmer Testimony, N.T. 7/1/10 at 53.

102.    Mr. Gemmer supervised placement of the event signs. B. Gemmer Testimony, N.T. 7/1/10 at 40.

103.    Ms. Gemmer generally drafted the committee meeting agendas, took notes at the meetings, and circulated them to the committee.  L. Gemmer Testimony, N.T. 6/30/10 at 71 - 72.

104.    The Gemmers maintained the show's records, which consist of complete volumes of the documents and records used to produce and manage each of the shows since 2006.  L. Gemmer Declaration at ¶ 40.

105.    Ms. Gemmer routinely requested that Surrey reimburse her for expenses for The Main Line Antiques Show.  Surrey never denied such an expense request.  Fentress Testimony, N.T. 7/14/10 at 10-12.

**H.    Dissolution of the Working Relationship Between Plaintiffs and Defendant.**

106.    In mid to late summer 2009,  Mr. Gemmer decided that he would no longer organize The Main Line Antiques Show to benefit Surrey.  B. Gemmer Testimony, N.T. 7/1/10 at 72 - 78.

107.    Just before and during the 2009 show, Ms. Gemmer also decided not to organize The Main Line Antiques Show for the benefit of Surrey any longer.  L. Gemmer Testimony, N.T. 6/30/10 at 115 - 116.

108.    Ms. Gemmer circulated an agenda for the 2009 wrap-up meeting of The Main Line Antiques Show committee following the show, as she usually did.  The 2009 agenda did not refer to the following year's show and simply noted: "Going forward."  L. Gemmer Testimony, N.T. 6/30/10 at 124, 129;  2007 Wrap-Up Meeting Agenda (Plaintiffs' Ex. 69); 2008 Wrap-Up Meeting Agenda (Plaintiffs' Ex. 70).

109.    At the 2009 wrap-up meeting, Ms. Gemmer stated that she would not do a 2010 show for the benefit of Surrey.  L. Gemmer Testimony, N.T. 6/30/10 at 125 - 126.

110.    At the wrap-up meeting, neither of the Gemmer's explicity claimed ownership of the owner of The Main Line Antiques Show trademark.  B. Gemmer Testimony, N.T. 7/1/10 at 100-101.

111.    On December 15, 2009, Mr. Gemmer wrote to the VFMA to reserve the dates for the weekend before Thanksgiving 2010 for The Main Line Antiques Show at Valley Forge Military Academy.  Email from B. Gemmer to Tim Flynn (Plaintiffs Ex. 67);  Email from L. Gemmer to Exhibitors (Plaintiffs' Ex. 32).

112.    Thereafter, the Gemmers began to look for a new beneficiary for the 2010 The Main Line Antiques Show. L. Gemmer Testimony, N.T. 6/30/10 at 132.

113.    The Gemmers met with representatives of Bryn Mawr Hospital on two occasions to discuss the possibility of putting on the 2010 The Main Line Antiques Show to benefit Bryn Mawr Hospital.  L. Gemmer Testimony, N.T. 6/30/10 at 132-133.

114.    In January 2010, the Gemmers met with Bryn Mawr Hospital's Development Department to discuss The Main Line Antiques Show.  L. Gemmer Testimony, N.T. 6/30/10, at 132.

115.    In February 2010, the Gemmers met with Bryn Mawr Hospital's Women's Board to discuss The Main Line Antiques Show.  L. Gemmer Testimony,  N.T. 6/30/10 at 132-133.

116.    Soon after the meeting with Bryn Mawr Hospital's Women's Board, the Gemmers were informed that Bryn Mawr Hospital was not interested in partnering with them on the 2010 The Main Line Antiques Show.  The Gemmers testified that representatives of Bryn Mawr Hospital began researching the possibility of becoming involved with the 2010 show and learned that Surrey was the former beneficiary.  Once Bryn Mawr Hospital learned of Surrey's previous

21

involvement with The Main Line Antiques Show, it declined to partner with the Gemmers. L. Gemmer Testimony N.T. 6/30/10 at 137-138; B. Gemmer Testimony, N.T 7/1/10 at 105-106.

117. The Gemmers do not have a beneficiary for a 2010 The Main Line Antiques Show. L. Gemmer Testimony, N.T. 6/30/10 at 138; B. Gemmer Testimony, N.T. 7/1/10 at 106. The Gemmers declined to provide any information about possible beneficiaries for a 2010 Show that they wish organize.

118. Surrey began preparations for the 2010 The Main Line Antiques Show after the wrap-up meeting for the 2009 show. Surrey initially attempted to reserve dates in October 2010, at VFMA for The Main Line Antiques Show, but the October dates conflicted with other antiques shows already scheduled. L. Gemmer Testimony, N. T. 6/30/10 at 133-135.

119. When Surrey contacted dealers regarding its efforts to create a 2010 The Main Line Antiques Show, some of those dealers responded to the Gemmers. It was then that the Gemmers learned that Surrey was planning to put on The Main Line Antiques Show in 2010, without the Gemmers participation or input. Email from L. Gemmer to Show Exhibitors (Plaintiffs' Ex. 32).

120. After learning of Surrey's intention to put on a 2010 The Main Line Antiques Show, Ms. Gemmer sent an email to the dealers stating that the Gemmers had reserved VFMA for the 2010 show and were still organizing The Main Line Antiques Show during the usual show dates. Ms. Gemmer also advised the dealers that she was attempting to secure a new beneficiary for the show. *Id.*

121. Mr. Vandekar, chair of Surrey's 2010 fall fundraiser committee, entered into discussions with Tim Flynn of VFMA in an attempt to secure the dates that the Gemmers had

reserved for the 2010 The Main Line Antiques Show.  B. Gemmer Testimony, N. T.  7/1/10 at 110.

122.    On January 20, 2010, Mr. Flynn informed the Gemmers that it was cancelling the Gemmers' reservation and giving that reservation to Surrey.  Email from Tim Flynn to B. Gemmer dated 1/20/10 (Plaintiffs' Ex. 33).  In a February 25, 2010, email, Mr. Flynn reiterated his refusal to give those dates to the Gemmers, stating that the venue was "staying with Surrey Services as the Sponsor group for the Antique Show."  Email from Tim Flynn to B. Gemmer dated 2/25/10 (Plaintiffs' Ex. 34).

123.    On January 13, 2010, the Gemmers filed an application to trademark the name The Main Line Antiques Show.  B. Gemmer Testimony, N. T. 7/1/10 at 79;  Trademark Application (Plaintiff's Ex. 59).

124.    On February 4, 2010, Surrey filed an application to trademark the name The Main Line Antiques Show.  Complaint at ¶ 49.

**I.    Expectations of the Parties**

125.    If awarded a preliminary injunction, the Gemmers represent that they could still produce a 2010 The Main Line Antiques Show for another beneficiary, particularly given their prior experience in organizing the shows between 2006 and 2009.   L. Gemmer Testimony, N.T. 6/30/10 at 144 - 145;  B. Gemmer Testimony, N.T. 7/1/10 at 88.  However, no beneficiary has been identified or named, no committee members (other than the Gemmers) have been identified, and no sponsors have been identified.

126.    Surrey is organizing The Main Line Antiques Show for November 2010. Surrey's fall fundraiser committee is organizing the Show.  Nick Vandekar, a member of Surrey's fall

fundraiser committee in 2005 - 2006 is the chair of the committee. Vandekar Testimony, N.T. 7/13/10 at 14.

127.    Surrey is contracted to hold the Show at VFMA. Surrey has twenty-eight dealers signed up for the Show and nine to ten sponsors. Surrey has distributed advertisements for the 2010 Show. If concerns about the present litigation cause VFMA to cancel the agreement with Surrey to host the Show, Surrey will look for a different venue. N.T. 7/13/10, Vandekar at 11, 13, 14.


## II.    CONCLUSIONS OF LAW

The primary purpose of a preliminary injunction is the maintenance of the status quo until a decision on the merits of a case is rendered. *Kos Pharmaceuticals, Inc. v. Andrx Corporation*, 369 F.3d 700, 708 (3d Cir.2004). "Status quo" is defined as the last, peaceable, noncontested status of the parties. *Id.* To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Rogers v. Corbett,* 468 F.3d 188, 192 (3d Cir. 2006) (*quoting Kos Pharmaceuticals*, 369 F.3d at 708); *McNeil Nutritionals, LLC v. Heartland Sweeteners*, 511 F.3d 350, 356-357 (3d Cir. 2007)(*quoting Shire U.S. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)). Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *Kos Pharmaceuticals*, 369 F.3d at 708 (*quoting American Tel. & Tel. Co. v.*

*Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)); *Nutrasweet Company v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir.1999).

The burden lies with the moving party to establish every element in its favor. *P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC.*, 428 F.3d 504, 508 (3d Cir.2005). An injunction cannot issue if either or both of the fundamental requirements - likelihood of success on the merits and probability of irreparable harm if relief is not granted - are absent. *McKeesport Hospital v. Accreditation Council for Graduate Medical Education*, 24 F.3d 519, 523 (3d Cir.1994).

I address each of these elements in turn.

**A.      Likelihood of Success on the Merits.**

To prove trademark infringement and unfair competition under the Lanham Act, a party must prove: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) use of the mark to identify goods or services is likely to create confusion. *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270, 279 (3d Cir. 2001) (*citing Commerce National Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437-38 (3d Cir.2000)). In this case, the parties do no dispute that the mark is valid and legally protectable, and that the likelihood of confusion exists. *Id.* The sole issue in dispute in the cross-motion for injunctive relief is ownership of the mark "The Main Line Antiques Show."[1]

---

[1]      In addition to cross-claims for Trademark Infringement that are the subject of the present cross-motion for injunctive relief, Plaintiffs have also asserted a claim for Unfair Methods of Competition and Unfair Acts (Complaint, Count II) and Pennsylvania Common Law Unfair Competition (Complaint, Count III); Defendant has also asserted counterclaims for Unfair Competition (Counterclaim, Count III), Unjust Enrichment (Counterclaim, Count IV) and Tortious Interference With Contractual Relations (Count V). However, the current cross-motions for injunctive relief concern only the Trademark Infringement claims.

The parties urge the Court to apply different tests to determine ownership of the mark. Plaintiffs argue that the "related companies" doctrine applies to this case, and that application of this doctrine leads to the conclusion that Plaintiffs own the mark. Defendant argues that the general rule is that ownership of the mark is determined by "use in commerce" of the mark, that this test applies in the present case, and establishes that Defendant owns the mark.

I will address the general rule first, and then consider the applicability of the alternative rule urged by Plaintiffs.

### 1. First Use

The parties agree that ordinarily, a party establishes ownership of a mark by being the first to use the mark in commerce. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991) ("With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it (the mark) in commerce."); *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir.1998) ("'[T]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods.'" *(quoting Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir.1975)); *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1473 (Fed Cir. 1987) ("Trademark rights in the United States are acquired by... adoption and use, not by registration"). Ownership of a trademark accrues when goods bearing the mark are "sold, displayed for sale or otherwise publicly distributed." *Lucent Information Management, Inc. v. Lucent Technologies, Inc.* 186 F.3d 311, 319 (3d. Cir. 1999) (quoting *Blue Bell v. Farah Manufacturing Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir.1975)). To establish prior use for a common law mark, distribution of the mark need not be wide-spread, but it must be of a public

nature and more than de minimus. *Allard Enterprises, supra.*

The use of the mark must constitute a realistic attempt to engage in commerce. "Use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not merely made to reserve a mark." *15 U.S.C. § 1127*. "Trademark ownership is always appurtenant to commercial activity," rather than creative activity,... "[and] actual and continuous use is required to acquire and retain a protectable interest in a mark." *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022-23 (11th Cir. 1989).

Plaintiffs claim that it is "undisputed that the first use of the name 'The Main Line Antiques Show' was by Ms. Gemmer on June 25, 2006, when Ms. Gemmer drafted sponsor letters and agreements for the show and included the show's name in those documents." *See* Pl.'s Proposed Findings of Fact at ¶ 273. Plaintiffs also rely on internal emails between Surrey volunteers (including Ms. Gemmer) and Surrey employees.

However, it is abundantly clear ownership of a trademark depends upon "first use in commerce," rather than mere "first use." "It is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods." *Sengoku Works LTD. v. RMC International, LTD.*, 96 F.3d 1217, 1219 (9th Cir. 1996) (citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition §16.03 (3d ed. 1996). As the Fifth Circuit has stated, "Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use'." *Blue Bell, Inc., supra,* 508 F.2d at 1265.

I therefore conclude that there is insufficient evidence to support the conclusion that Plaintiffs were the first to use the mark in commerce.

Defendant provides ample evidence that they are likely to succeed on the merits in proving that Defendant first used the mark in commerce. Defendant used the mark in donor appeals, which were sent out on Surrey stationery, and through offers made to prospective dealer/clients of The Main Line Antiques Show. These uses occurred in the summer of 2006, when Surrey informed potential sponsors that it was "thrilled to be bringing a high quality antique show back to the Main Line." *See* Defendant's Ex. 35.

Indeed, virtually *all* of the evidence relating to the *use in commerce* of the name "The Main Line Antiques Show" connects the show to Surrey. The invitations, advertising materials, sponsorship letters, and everything else that constituted the "public face" of The Main Line Antiques Show" connected the event to Surrey Services for Seniors. *See e.g.,* Defendant's Ex.45, 59, 67, 92, 95, 99, 100, 108, 119, 141, 143, 160, 164, 165. To the extent Plaintiffs are mentioned in any of these materials, they are listed by their committee participation, and as a contact person. By way of example, the 2006 Brochure (Defendant's Ex. 67) lists Surrey's name three times, and includes Surrey's trademarked "lotus flower" design twice, and provides a three paragraph explanation of Surrey and it's mission. In contrast, Lydia Gemmer's name is listed as Committee Chairperson of the event, and Baron Gemmer is identified of one of more than twenty members of the volunteer committee.

Moreover, the business relationships essential to producing the Main Line Antiques Show were between Surrey and the various third parties. For example, the event's sponsors received solicitations (*see e.g.,* Defendant's Exhibit 95) and thank you letters *(see e.g.,* Defendant's Ex. 45) on Surrey letterhead, signed by Surrey President Jeanne LaRouche and by Lydia Gemmer, as Chair of the event. The contract for rental of the VFMA space was between Valley Forge

Military Academy and Surrey, with Surrey accepting all of the contractual rights and obligations *(see e.g,* Defendant's Exhibit 30). The Dealer contracts were between the individual antiques dealers and Surrey, with Surrey (again) retaining all of the contractual rights and obligations (*see e.g.,* Defendant's Ex. 31).

Against this factual record, I conclude that Surrey was the entity that "used" the mark "The Main Line Antiques Show" in commerce. I respectfully recommend that the Court find in favor of Surrey on this issue.

### 2. Plaintiffs' Claim of Ownership Based Upon the "Related Companies" Doctrine.

Plaintiffs argue that the Lanham Act permits an applicant to establish ownership under the "related companies" doctrine by showing that it first *used* the mark (as opposed to establishing *"use in commerce"* of the mark), or that it controlled the first user of the mark." *See* Pl. Brief in Support of Motion for Preliminary Injunction, pp. 16-21. Plaintiffs rely on Section 5 of the Lanham Act, which states:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be."

15 U.S.C. § 1055.

I address each aspect of Plaintiffs' "related companies" arguments.

### a. "First Use" of The Mark.

The linchpin of this claim is the contention that Plaintiff Lydia Gemmer was the "first" to

"use" the mark, because she drafted sponsorship letters and agreements on June 25, 2006, using the name, "The Main Line Antique Show" in those letters. *See* Pl. Proposed Findings of Fact at ¶273. I recommend against applying such great importance to one act (of many) done in furtherance of producing Surrey's fall fundraiser.

First and foremost, these draft letters that Plaintiffs rely upon make it abundantly clear that Ms. Gemmer was acting as a volunteer on behalf of Surrey in undertaking this task. The draft letter prepared by Ms. Gemmer highlights the important community functions that Surrey performs, and states "Surrey invites you to be a partner in helping our local seniors by sponsoring The 2006 Main Line Antique Show." *See* Pl. Exhibit 3.[2]

Second, this argument extracts this one event (the physical act of drafting letters) from a series of events, and exalts this one event over all else. Other evidence of record casts considerable doubt on the contention that this was in fact the "first use" of the mark sufficient to confer trademark ownership on the Plaintiffs. Multiple witnesses testified that the name "Main Line Antique Show" was discussed at volunteer committee members, prior to the date that Ms. Gemmer typed the draft letters. This testimony undercuts the contention that the letter-drafting was, in fact, the "first use" of the mark. Indeed, in early 2006, as the committee members discussed the new proposed name among themselves, members of the committee recalled that another antiques dealer (Mancuso) had previously put on a show known as the "Main Line

_____

[2]     There is no evidence that this draft letter was actually sent to prospective sponsors. Indeed, a different letter was sent to sponsors in 2006. That letter, sent on Surrey stationery and in Surrey envelopes, stated "Surrey Services for Seniors is thrilled to be bringing a high quality antiques show back to the Main Line!" The letter was signed by Lydia Gemmer, as "Chairperson, Antiques Show Committee" and by Jeanne LaRouche, Surrey President. *See* Defendant's Ex. 34 and LaRouche Testimony, N.T. 6/30/10 at 187-189.

Classics Antique Show."  Surrey volunteer Roberta Hollingshead telephoned Mr. Mancuso to ensure that he had no objection to Surrey using the mark, "Main Line Antique Show."  *See* Defendant Ex. 201, ¶12.  Against this backdrop, this Court rejects the contention that Ms. Gemmer's draft letter, prepared some time in June 2006, constituted a "first use" sufficient to confer ownership of the mark.

Moreover, as discussed above, the commercial activity in which the mark was used - solicitation and acknowledgment of sponsors; publicizing the event to the public; contractual agreements - was under Surrey's banner.  The Gemmer's are not mentioned at all in many of these materials; where the Gemmer's are mentioned, they are listed as Event Chair (Ms. Gemmer) and committee member (Mr. Gemmer).

I conclude that Plaintiffs have failed to establish the likelihood of succeeding on this theory.   I respectfully recommend that this claim be rejected.

**b.** **Control of the Nature and Quality of the Goods Sold.**

Alternatively, Plaintiffs argue, the Lanham Act permits an applicant to establish ownership under the "related companies" doctrine by showing that it controlled the first user of the mark.  Plaintiffs contend that "the first use of the trademark need not be made by the trademark owner and can be made by or through a 'related company.'  'Use of a trademark need not always be made directly by the trademark owner and is often made with the permission of the owner via a licensing agreement.  Indeed, sometimes the only use of a mark is through a licensee.'"  *See* Pl. Brief in Support of Motion for Preliminary Injunction at p. 18 (Doc. No. 5) (citing *Doeblers' Pennsylvania Hybrids, Inc., v. Doebler II,* 442 F.3d 812, 823 (3d Cir. 2009); 2

*McCarthy on Trademarks §18:46).* [3]

The "related companies" doctrine is set forth in 15 U.S.C. § 1055, which states as

follows:

> **Use by related companies affecting validity and registration**
> If first use of a mark by a person is controlled by the registrant or applicant for
> registration of the mark with respect to the nature and quality of the goods or
> services, such first use shall inure to the benefit of the registrant or applicant, as
> the case may be.

15 U.S.C. § 1055.

Plaintiffs state that the Third Circuit "recognized" the "related companies" doctrine in the

*Doebler* case. *See* Pl. Proposed Findings of Fact and Conclusions of Law, ¶ 270. I disagree with

any suggestion that the Third Circuit has explicitly embraced the related companies doctrine as

---

[3] Plaintiffs seem to suggest that Surrey was a licensee of "The Main Line Antiques
Show." *See* Pl. Brief in Support of Motion for Preliminary Injunction at p.18 (Doc. No. 5).
Based on the record before the Court, I reject any suggestion that any licensing agreement existed
between the parties. There is no evidence that would establish the existence of an explicit license
between Plaintiffs and Surrey for use of the "The Main Line Antique Show" trademark.

Nor does the record support a contention that an "implied license" existed between the
parties. An implied license for the use of a trademark may be found to exist when the objective
conduct of the parties indicates that an agreement has been reached. *Villanova Univ. v. Villanova
Alumni Educational Foundation, Inc.*, 123 F.Supp.2d 293, 307 (E.D. Pa. 2000) (Brody, J.)
("[A]n implied license in fact 'arises out of the objective conduct of the parties, which a
reasonable person would regard as indicating that an agreement has been reached.'").

Plaintiffs have failed to provide any evidence of objective conduct between the parties
that would indicate that an agreement had been reached regarding use of "The Main Line
Antiques Show" trademark. This argument hinges on the presumption that the Gemmer's owned
the mark from the inception, and then granted Surrey permission to use the mark. However, both
parties testified that no discussion of who owned the mark at issue ever occurred. Both parties
offered testimony that nobody had ever given "ownership" of the mark much (if any) thought.
Plaintiffs, who seek to establish that they licensed the mark to Surrey, never indicated their
ownership of the mark "The Main Line Antiques Show," either explicitly or impliedly. The
objective conduct of the parties would not lead a reasonable person to conclude that the parties
agreed or understood that Surrey was merely using the mark as a licensee.

an alternative method of determining ownership of a disputed mark.

In *Doebler,* the Third Circuit's mentioned the related companies doctrine in *dicta*, while discussing the Plaintiff's contention that Plaintiff owned the mark because it had been "abandoned" by the Defendant/trademark owner.  According to the Third Circuit, both parties acknowledged that they had both used the mark concurrently.  The Third Circuit observed that trademarks are often used by another  "with the permission of" the mark's owner, and such licensing arrangements "are permissible so long as the license agreement provides for adequate control by the licensor of the nature and quality of the goods or services."  *Doebler*, 442 F.3d at 823.  The Third Circuit explained that trademark licenses are typically written, and contain express terms to ensure that the mark owner exercises quality control over the goods sold.  Uncontrolled licensing of a mark is known as "naked licensing," through which the licensee might place the mark on any types of goods or services, raising a "grave danger" that the public might be misled as to the nature and quality of the goods.  To protect the public, the owner of the mark must police the nature and quality of the goods sold.  Failure to provide quality control (and the resulting failure to protect the public) can lead to abandonment of the mark.  *Id.* at 823-24.

In the course of this discussion, the Third Circuit cited to the "related companies" doctrine in a footnote, stating that licencing agreements are permissible as long as the owner of the mark controls the nature and quality of the goods, to protect the public.  The *Doebler* Court did not explicitly embrace the "related companies" doctrine as an alternative method of establishing ownership.

Other circuits have similarly explained the scope and operation of the "related companies" doctrine.  For example, in *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070 (5th

Cir. 1997), Exxon brought suit against a clothing manufacturer, alleging that the clothing manufacturer's trademark diluted the oil company's trademark. The clothing manufacturer raised an affirmative defense of "naked licensing," arguing that "phase out" agreements between Exxon and other infringers constituted "naked licenses." Oxxford argued that these agreements, which authorized third parties to continue to use infringing or diluting marks with Exxon's knowledge and approval, were "licenses"; and, because these "licenses" contained no quality control provision, they were "naked licenses" which could lead to forfeiture of Exxon's rights in its licensed marks.

Rejecting this argument, the Fifth Circuit noted that Section 1055 does not of itself establish a naked licensing defense. Rather, "its effect is merely to reflect conditions under which certain conduct is not per se precluded from consideration, as supportive, to the extent that it may logically do so in a given setting, of a determination that there has been abandonment as defined in section 1127(2)." Similarly, in *Jabbour v. Caterpillar Tractor Co.,* 780 F.2d 1021 (6th Cir. 1985) in context of product liability claim, the Sixth Circuit observed that under the Lanham Act, "the owner of a registered trademark risks being held to have abandoned the mark if it permits the use of the mark by an entity that is not a related the exercise of actual control or the appearance of control, induces in the public mind the impression that it is responsible for the nature and quality of the product." *See also Billy Baxter, Inc. v. Coca-Cola Co.* 431 F.2d 183, 193 n.1 (2d Cir. 1970)(dissent) ("unless the licensor exercises supervision and control over the operations of its licensees the risk that the public will be unwittingly deceived will be increased and this is precisely what the Act is in part designed to prevent. *See Sen. Report No. 1333, 79th Cong., 2d Sess. (1946).* Clearly, the only effective way to protect the public where a trademark is

used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees."); *Dawn Donut Co. v. Hart's Food Stores, Inc*., 267 F.2 358, 367 (2d Cir. 1959) (Section 1055 of the Lanham Act "clearly carries forward the view ... that controlled licensing does not work an abandonment of the licensor's registration, while a system of naked licensing does... Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities.")[4]

---

[4] The Ninth Circuit's decision in *Secular Organizations for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125 (9th Cir. 2000) ("*SOS")* appears to most closely parallel the situation presented in this case. *SOS* involved a disputed claim of ownership of the names "Secular Organization for Sobriety" and "SOS," names that grew out of a self-help movement launched by James Christopher in the mid-1980's. The terms "SOS" and "SOS movement" were first used in a newsletter published by the Council for Democratic and Secular Humanism ("CODESH").

In the late 1980's, individuals who subscribed to SOS' teachings began actively spreading the message and teachings of the movement in Northern California. By 1990, approximately 20 SOS groups operated in Northern California on a volunteer basis. Throughout these formative years, Christopher, the group's "founder," repeatedly emphasized the individual nature and autonomy of the various chapters, and disavowed any centralized organization. According to Christopher, the SOS National Clearinghouse was a "facilitator" of the movement, acting as a resource for the individual chapters of the movement. *Id*. at 1127-28.

As the movement continued to grow, individuals who had worked on the effort became disenchanted with the lack of organization, and in 1990, discussed these concerns with Christopher. Christopher did not respond to these concerns, and moved to New York to accept a salaried position with CODESH. In the wake of his departure, the Northern California group continued to organize and grow the movement, and formally incorporated the movement in January 1991 as a non-profit membership corporation, "West Secular Organizations for Sobriety, Inc.," or "SOS - West." However, unbeknownst to the Northern California group, in October 1990, CODESH had applied with the Patent and Trademark Office for federal registration of the mark "Secular Organization for Sobriety." At the time of such application, CODESH was aware that Northern California groups of this name had been operating since early 1988.

CODESH and SOS, Inc. sued to enjoin the Northern California group's use of the marks

The cases from other Circuits cited by Plaintiffs in urging the Court to apply the "related companies" doctrine to determine ownership are unavailing to Plaintiffs' position. Plaintiffs first cite to *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341(D.C. Cir. 2008). *Coll-Monge* concerned an individual (Coll) who had registered five marks, and then used them exclusively through a non-profit entity. The District Court granted summary judgment in favor

---

"Secular Organizations for Sobriety" and/or "SOS." The District Court ruled in favor of SOS-West and against SOS, Inc., and the Ninth Circuit affirmed. The Ninth Circuit addressed the "related companies" doctrine in response to SOS Inc., argument that SOS-West used the marks "under the auspices of" SOS, Inc. The Ninth Circuit described the "related companies" doctrine: "the first use of a mark by a person 'controlled by the registrant or applicant for registration of the mark' shall inure to the benefit of the controlling entity." *Id.* at 1131. The Court found that the doctrine "requires a showing of a substantial relationship between appellants and appellees." The Court found that the record evidence supported the District Court's determination that SOS, Inc. did not exert control over SOS-West. *Id.* The Ninth Circuit thus affirmed the District Court's conclusion that because "CODESH was not related as a parent company or in any other manner to the local SOS groups, the related companies doctrine does not entitle CODESH to the benefit of the use of the mark by the local SOS groups." *Secular Organizations for Sobriety, Inc. v. Lenihan,* 1997 WL 564061 at *5 (N.D. Cal., Aug. 27, 1997).

Thus, in the case that most closely parallels the situation presented here, the Court did *not* grant ownership of a trademark on the basis of the "related companies" doctrine. The Ninth Circuit suggested that ownership of the mark might be so determined, in a case where there is a substantial relationship between the parties claiming ownership in the mark. Even if this Ninth Circuit decision can be fairly read as authority for the proposition that the "related companies" doctrine can be used to determine ownership of a disputed mark, the doctrine requires a "substantial relationship" between the parties. Nothing in the Ninth Circuit's decision supports the argument Plaintiffs advance here, that "control" over the nature and quality of the goods is sufficient to subvert the over-arching rule: ownership of the trademark is established through public use of the mark in commerce.

Plaintiffs also point out that "related company" is defined by the Lanham Act in §1127, as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." Reliance on this definition presents a "chicken or the egg" riddle, in that it addresses a situation where one entity is using a mark, under the control of the *owner* of the mark. Of course, this is the very question presented by this case - who owns the mark?

of the non-profit, concluding, *inter alia*, that Coll had registered the marks as a representative, and on behalf, of the non-profit.  The District of Columbia Circuit reversed the grant of summary judgment, finding that Plaintiff had injected sufficient questions of fact on the issue of whether Coll had controlled the use of the marks from the first use of same, making summary judgment in favor of the non-profit inappropriate  524 F.2d at 1348-1349.

The *Coll-Monge* court was confronted with a situation where the individual - Coll - had actually registered the marks in dispute.  When Coll's Estate sought to enjoin the defendant/non-profit's use of the mark, defendant argued that Coll had registered the marks on the non-profit's behalf, and that the non-profit organization exclusively used the marks.  The Estate argued that Coll had been in "complete control" of the non-profit organization, including the use of the mark, and further pointed out that Coll had repeatedly asserted his "complete control" over the marks in Patent and Trademark Office filings.  The Court of Appeals remanded the matter to the District Court for a factual determination on this issue, as well as the issue of the capacity in which Coll registered the marks with the USPTO.[5]   In contrast, the present dispute concerns a situation where the disputed mark was not registered by *either* of the parties now claiming to own the mark, to the exclusion of the other party.

*In re Briggs*, 229 U.S.P.Q. 76, 1986 WL 83654 (TTAB 1986), also cited by Plaintiffs, concerned an appeal from the denial of an application for a service mark.  In that case, an individual sought to register a mark that he created, then used exclusively through a corporation.

---

[5]      Indeed, the D.C. Circuit remanded the case, finding that "there remain disputed issues of fact regarding both the [related companies] doctrine's applicability here and the capacity in which Coll registered the marks with the USPTO."  A September 3, 2010 check of the District of Columbia District Court Docket, *Estate of Coll-Monge v. Inner Peace Movement,* C.A.No. 01-271, revealed that the remand remains under consideration by the District Court.

The examiner denied the application, saying that evidence was insufficient to support the conclusion that the applicant controlled the nature and quality of the goods. The Appeal Board reversed, finding that there was sufficient evidence to conclude that applicant had controlled the nature and quality of the goods, and thus granted the service mark application.

Plaintiffs also cite *Floater Vehicle, Inc. v. Tryco Mf'g. Co., Inc.,* 497 F.2d 1355 182 U.S.P.Q. 203 (C.C.P.A. 1974) and *Connelly v. ValueVision Media, Inc.,* 2004 WL 2569494 (D. Minn., Nov. 9, 2004). However, both of these cases concerned the resolution of intellectual property developed by employees of a company, both of whom had signed employment agreements that addressed the development of intellectual property. In each case, their employer claimed ownership of the trademarks at issue, and the court was largely focused on deciding the nature and scope of the employment agreement's intellectual property provisions.

Thus, *Briggs, Floater Vehicle,* and *Connelly* shed no light on the issue before us now, whether the related companies doctrine may operate to create ownership rights,[6] where the ownership of the mark is very much disputed.

Against this backdrop, I consider Plaintiffs' contention that Ms. Gemmer's efforts in producing The Main Line Antiques Show means that the Gemmer's own the mark. I conclude that an exhaustive review of case law leads to the conclusion that Plaintiffs cannot establish that they are likely to succeed on this claim. We have not found (nor have the parties cited) any case law that holds that disputed ownership of a mark - in a situation where neither party has

---

[6] I parenthetically note that Plaintiffs' "related companies" argument hinges on the presumption that the statutory language "inures to the benefit of" actually means "creates an ownership interest in favor of." We have been unable to find any authority (nor have the parties cited any) that explains the meaning of the phrase "inures to the benefit of."

registered the mark[7] - can be determined based on "control" of the "nature and quality of the goods sold."  One Circuit - the Ninth Circuit - has arguably suggested that the "related companies" doctrine *might* operate to supplant the general rule that ownership is established through use in commerce.  However, nothing in that decision supports the contention that mere "control" of the "nature and quality of goods sold" is enough; the Ninth Circuit required a "substantial relationship" between the parties. Plaintiffs have not made any such showing here.

I therefore respectfully recommend that this claim be rejected.

## B.     Irreparable Harm

The second and third prongs of the preliminary injunction test call for a balancing of the irreparable harms that may befall the parties if injunctive relief is not granted.  Of course, this case involves cross-claims of trademark infringement.  "It  is generally recognized in trademark infringement cases that (1) there is not adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm."  *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852 (7th Cir. 1982).  Where a party establishes the probability of succeeding on the merits in a trademark infringement case, the "inescapable conclusion is that there was also irreparable injury." *Opticians Assoc. of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990)

Both parties have moved for preliminary injunctions barring the other from use of the

---

[7]     At least one court has determined that the "related companies" doctrine does not apply when the party claiming ownership has not registered, or sought to register, of the disputed marks.  *See Carpentieri v. Marini*, 2006 WL 2349586 (D. Conn. July 11, 2006).  Here, neither party sought to register the mark until after their relationship had dissolved, when the mark had been used in commerce for over three years.  Indeed, as noted elsewhere, both parties offered testimony that they never gave registration of the mark any thought until their relationship had ended.

mark. "One who uses another's marks without permission 'can hardly claimed to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Villanova University v. Villanova Alumni Educational Foundation, Inc.*, 123 F. Supp. 2d 293, 311 (E.D. Pa. 2000) (*quoting Id.* at 197).

Since I have concluded that Surrey is the proper owner of the mark, and the Gemmer's are not, I similarly conclude that Surrey has established irreparable harm caused by the use of the mark by the Gemmer's. I therefore respectfully recommend that the Court find in favor of Surrey on this element.

###C. Public Interest

In guarding the public interest, courts are expected to protect "the right of the public not to be deceived or confused." *Id.* at 197-98, (*quoting 2 McCarthy, § 30:21*). Here, it seems clear that confusion will occur if both parties continue to use "The Main Line Antiques Show" mark. Both parties seek to put on an antique show, in the same location, at the same time of year, bearing the same name. The public interest militates in favor of having *one* show of this name, to avoid confusion on the part of consumers and potential sponsors of the Show.

Accordingly, based upon all the foregoing, I respectfully make the following Recommendation.

## R E C O M M E N D A T I O N

**AND NOW**, this 7th day of September, 2010, I **RESPECTFULLY RECOMMEND** that Plaintiff's Motion for Preliminary Injunction be **DENIED**, and Defendant's Motion for Preliminary Injunction be **GRANTED**.  I respectfully RECOMMEND that the District Court issue an Order enjoining Plaintiffs Baron Gemmer and Lydia Gemmer from using the name "The Main Line Antiques Show" in the production of any antique show, in advertisements or invitations for any antique show, in solicitations for any antique show, or in entering into contracts related to the production of any antiques show.


BY THE COURT:


 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE