IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARON G. GEMMER and :
LYDIA S. GEMMER
    Plaintiffs,
: CIVIL ACTION
v. NO. 10-810

SURREY SERVICES FOR :
SENIORS, INC.
    Defendant.

## ORDER

AND NOW, this 9th day of December, 2010, upon review of the Report and

Recommendation of United States Magistrate Judge Lynne A. Sitarski (Doc. No. 59), and the

Objections filed thereto (Doc. Nos. 60 & 61),[1] it is hereby ORDERED as follows:

---

[1] Both Plaintiffs and Defendant filed Objections to the Honorable Lynne A. Sitarski's Report and Recommendation (hereinafter "R&R" or "Report"). It is well-settled that:

> Where objections to a magistrate judge's report are filed, the Court must conduct a *de novo* review of the contested portions of the report, provided the objections are both timely and specific. In its *de novo* review, the Court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. Although the review is *de novo*, the statute permits the Court to rely on the recommendations of the Magistrate Judge to the extent it deems proper. Uncontested portions of the report may be reviewed at a standard determined by the district court. At the very least, the Court should review uncontested portions for clear error.

*Bronson v. Neal*, 2010 U.S. Dist. LEXIS 83387, at **2-3 (M.D. Pa. Aug. 16, 2010)(internal citations omitted).

    Since its inception, this Court has extensively familiarized itself with this matter. Review of the uncontested portions of Judge Sitarski's R&R demonstrate no clear errors but instead, reveal a painstakingly thorough understanding and assessment of the underlying facts and legal precepts associated therewith.

(continued...)

[1] (...continued)
With regard to the parties' specific Objections to said R&R, this Court finds as follows:

Defendant's Objections:

(1) Defendant's Objection to Paragraph 35: Overruled.
Paragraph 35 of the Report reads, "The Gemmers, accompanied at times by other volunteers, investigated many potential locations on the Main Line for the antiques show, and eventually decided on the Valley Forge Military Academy and College." (R&R, ¶ 35.) In support of its Objection, Defendant cites the Declaration of Krista Friedrich, which reads in part, "Several people including ... Ms. Gemmer ... all went to review the venue. Other volunteers may have come as well. We all approved of the venue. The committee then decided to hold Surrey's The Main Line Antiques Show at that venue where it has been held since 2006." (Def.'s Objections, ¶ 2, citing Decl. of Krista Friedrich at ¶ 11.) The language from Ms. Friedrich's Declaration is not inconsistent with the Report, which explicitly recognizes that other volunteers also participated in the process of selecting a venue. Although the Report may be read to imply that Mrs. Gemmer had a more prominent role in the selection process, that implication is irrelevant, since it is equally consistent with the actions she took in her role as the Main Line Antiques Show ("MLAS") committee chairperson. Even if Defendant's desired language were to be adopted in lieu of the language in the Report, it would not affect the court's decision. Accordingly, the language as it currently exists in Paragraph 35 of the R&R shall remain.

(2) Defendant's Objection to Paragraph 65: Sustained in Part.
Paragraph 65 reads, "Mr. Gemmer registered the website in his name and owns the website." (R&R, ¶65.) Defendant argues, "The website is registered by Mr. Gemmer in his capacity as a volunteer for Surrey Services for Seniors. Surrey Services for Senior's [sic] volunteer Glen Barton initially designed the website. All of the material on the website uses Surrey's trademark The Main Line Antiques Show." (Def.'s Objections, ¶2.) Mr. Gemmer's registration and ownership of the website itself are not disputed. (B. Gemmer Dep. 49:7-25; 50:1-10; July 1, 2010; J. LaRouche Dep. 9:3-20, July 2, 2010.) However, it appears clear that Mr. Gemmer was acting as a volunteer for Surrey at the time he registered the website. (*Id.*) As such, Paragraph 65 of the Report shall be amended to the extent that the record reflects that Mr. Gemmer registered the website in his capacity as a volunteer for Surrey, thereby rendering the remainder of Defendant's Objection moot. The Report elsewhere references the fact that Glen Barton, a Surrey volunteer, was acknowledged by Surrey for designing the website. (R&R, ¶ 64.) Additionally, ownership of the trademark used on the website is precisely the central issue in this matter and is thoroughly addressed by the Report in its Conclusions of Law. (*Id*. at 24-39.)

(continued...)

[1] (...continued)

 (3) Defendant's Objection to Paragraph 118: Sustained in Part.
Paragraph 118 of the Report reads in part, "Surrey initially attempted to reserve dates in October 2010, at VFMA for The Main Line Antiques Show, but the October dates conflicted with other antiques shows already scheduled." (R&R, ¶118.) Defendant instead suggests that said Paragraph should read: "Surrey initially attempted to schedule the 2010 The Main Line Antiques Show for its regular dates in November; however, Surrey was advised that those dates had already been reserved. Surrey then attempted to reserve the October dates for The Main Line Antiques Show." (Def.'s Objections, p. 1.) The record is consistent with Defendant's assertion that Surrey first attempted to reserve the regular MLAS dates in November. (Def.'s Ex. 211 at 5-9.) Only after Surrey was advised that those dates had already been reserved, did Surrey next attempt to reserve the October dates, although those dates ultimately conflicted with other antiques shows already scheduled. (Def.'s Ex. 211 at 5-9; L. Gemmer Dep. 134:9-19; 135:18-25; 136:1-6, June 30, 2010.) Accordingly, Paragraph 118 is hereby amended to reflect the foregoing and the remainder of said Paragraph shall remain as it currently exists.

 (4) Defendant's Objection to Paragraph 126: Sustained in Part.
Paragraph 126 of the Report reads in pertinent part, "Nick Vandekar, a member of Surrey's fall fundraiser committee in 2005-2006[,] is the chair of the committee." (R&R, ¶126.) Said language is hereby amended to indicate that Mr. Vandekar has been a member of the fall fundraising/MLAS committee since 2006 and has remained so to date, as the record so reflects. (Vandekar Dep. 8:11-24; 10:2-10; 14:14-20.) The remainder of paragraph 126 of the Recommendation is adopted.

 (5) Defendant's Objection to Paragraph 3 of the Proposed Order: Sustained in Part.
Paragraph 3 of Judge Sitarski's proposed Order reads: "It is HEREBY ORDERED that Plaintiffs Baron Gemmer and Lydia Gemmer are enjoined from using the name 'The Main Line Antiques Show' in the production of any antique show, in advertisements or invitations for any antique show, in solicitations for any antique show, or in entering into contracts related to the production of any antiques show." Defendant asserts that the Order should also apply to "any other similar name or mark" and that the Order should be extended to include use in domain names and PTO applications. (Def.'s Objections, p. 2.) In response, Plaintiffs argue that the injunction should not be extended to domain name ownership because "[m]ere ownership of a domain name, without a bad faith intent to profit from the domain name" does not violate the Lanham Act, 15 U.S.C. § 1125(d) (providing for civil liability in the case of "cyberpiracy"). As a preliminary matter, this Court finds Plaintiffs' reliance on 15 U.S.C. § 1125(d) to be misplaced for purposes of the injunctive relief issue currently at bar. The domain name in

(continued...)

[1] (...continued)
question here, "MLAS.org," is so closely associated with the MLAS itself, that its continued operation would be irreconcilable with the vitally necessary equitable remedies set forth in the remainder of this Court's Order. Accordingly, Paragraph 3 of the proposed Order is amended as set forth herein.

Plaintiffs' Objections:

(1) Objection to court's application of the "related companies" doctrine: Overruled.
In reaching its Recommendation, the court specifically contemplated applying two distinct tests to determine ownership of a trademark. First, the court considered the general rule that ownership of a trademark is determined by the first use of that mark in commerce. (R&R, 26-29.) Next, the court considered the "related companies" doctrine, which recognizes that ownership can be established when one party demonstrates control over the first legitimate use of a mark by a related company. (*Id*. at 29-39.) The Report appropriately rejected the "related companies" doctrine and adopted the general rule. For the "related companies" doctrine to apply, there must necessarily be two distinct parties, or "related companies," which effectively function as licensor and licensee. The Report correctly finds that no type of licensing agreement existed in this matter, either explicitly or impliedly. (R&R, n. 3.) Instead, the record clearly demonstrates that both parties used the MLAS mark and neither party ever claimed ownership until some time after the Gemmers withdrew from the MLAS committee in late 2009. (R&R, ¶¶ 57, 110.) The Report appropriately concludes that the necessary licensor/licensee relationship could not be found to exist absent any clear agreement or implied understanding between the parties.

Plaintiffs assert that Surrey and the Gemmers are "separate persons / entities" and "the Court must determine between the parties which legally owned the trademark and which party used the trademark with the owner's permission." (Pls.' Objections, 1-2.) However, Plaintiffs' argument overlooks a substantiated finding that the Gemmers used the MLAS trademark as volunteers on Surrey's behalf. To this end, the Report makes a considerable number of relevant findings of fact supported by the record. To wit, Mrs. Gemmer approached Surrey as a volunteer, filled out a Surrey Volunteer Application, and expressed interest in development and special events committees. (R&R, ¶ 9.) Mrs. Gemmer organized and chaired Surrey's fall fundraising event in 2005, entitled Surrey's First Annual Antique Appraisal Fest and Silent Auction. (*Id*. at ¶¶ 20, 22.) During the 2005 wrap-up meeting, Ms. Hollingshead, a Surrey volunteer, suggested the event be changed from an "Appraisal Fest" to an antiques show. (*Id*. at ¶ 31.) The name of the event evolved from Surrey's Antique Show into the Main Line Antiques Show. (*Id*. at ¶ 42.) Moreover, the facility rental

(continued...)

¹ (...continued)
     agreement for the MLAS was between VFMA and Surrey, the Exhibitors' / Dealers' contracts were between the dealers and Surrey, and the security contract was between a private security company and Surrey. (*Id*. at ¶¶ 39, 41, 51.) Additionally, the sponsor letters were sent out from Surrey, on Surrey Letterhead, and signed by Ms. Gemmer in her capacity as chairperson and Ms. LaRouche in her capacity as Surrey President. (*Id*. at ¶ 48.) Surrey was responsible for all financial obligations associated with the show, including reimbursement of the Gemmers and continued to pay all MLAS expenses from 2006 to the present. (*Id*. at ¶¶ 53, 56, 60. Advertising for the MLAS contained Surrey's logo and directed inquiries to the show's website or Surrey's offices. (*Id*. at ¶ 68.) Many of Surrey's paid employees and longtime volunteers served as board members and worked at the show itself, both during work hours and on their own time. (*Id*. at ¶¶ 62, 77.) In 2008 and 2009, Surrey also hired public relations consultants to help market the show on Surrey's behalf. (*Id*. at ¶ 69.) A majority of sponsors were Surrey board members, past board members, and friends of Surrey and most monetary donations came from benefactors of the Surrey organization. (*Id*. at ¶ 78.) The Report also details Plaintiffs' tremendous involvement in the show. The court found that Mr. and Mrs. Gemmer spent more than 5,000 hours of volunteer time on the shows between 2006 and 2009 - planning, creating budgets, contacting and working with dealers and sponsors, negotiating contracts for Surrey, marketing the show, training other volunteers, and overseeing logistics. (*Id*. at ¶¶ 79-105.) However, the record makes equally clear that these activities were undertaken in the capacity of volunteers on behalf of Surrey, a conclusion also noted in the Report. (*Id*. at ¶ 30.) Based on this significant factual record, the Report properly concludes that the Gemmer's actions were performed in the capacity of volunteers for Surrey. As volunteers, the Gemmer's use of the MLAS mark would be more appropriately attributed to Surrey rather than vice versa. As a result, the issue before this Court is not an issue of joint ownership or the use of a mark by "related companies" as contemplated in the Lanham Act. This Court instead looks to the general rule of ownership, as applied in the Recommendation, which leads to the conclusion that Defendant first used the MLAS mark in commerce and is the party more likely to succeed on the merits of its motion for a preliminary injunction.

(2)  Objection to conclusion that a party cannot establish trademark ownership pursuant to the "related companies" doctrine and the language of the Lanham Act: Overruled.
     For the reasons set forth immediately hereinabove, the "related companies" doctrine is not applicable in this case. In a footnote, the Report suggests that the phrase "inures to the benefit of" may not mean the same things as "creates an ownership interest in favor of." (R&R, n. 6.) Plaintiffs argue that the relevant portion of the Lanham Act, 15 U.S.C. § 1055, contemplates that an ownership interest can be created through the type of licensor/licensee

(continued...)

¹ (...continued)

relationship described in the "related companies" doctrine. Plaintiffs have cited to case law and language in the Lanham Act itself to support this interpretation. However, while the "related companies" doctrine may be appropriate to establish trademark ownership in some cases, it is not applicable here for reasons previously discussed and the footnoted comment does not in any way affect the validity of the Report's ultimate conclusion. Therefore, regardless of whether the "related companies" doctrine is capable of creating ownership of a trademark, application of that doctrine is properly rejected here in favor of general rules of trademark ownership.

(3) Objection to the conclusions regarding "first use of the mark" or "first use of the mark in commerce": Overruled.
The first use of the MLAS mark in commerce was made by Surrey. The Report, applying the general rule of trademark ownership, concludes, "Surrey was the entity that 'used' [the MLAS mark] in commerce." (R&R, 29.) Plaintiffs contend that it was the Gemmers, and not Surrey, that first used the mark. The dispute hinges on the meaning of "first use in commerce." The Report begins by identifying the general rule of trademark ownership as stating, "a party establishes ownership of a mark by being the first to use the mark in commerce." (*Id*. at 26)(citation omitted.) The court continues, "'Trademark ownership is always appurtenant to commercial activity,' rather than creative activity..." (*Id.* at 27)(citation omitted.) The Report then concludes that Defendant first used the MLAS mark in commerce "[ ]in donor appeals, which were sent out on Surrey stationery, and through offers made to prospective dealer/clients of The Main Line Antiques Show." (*Id*. at 28.) Despite Plaintiffs' claims, the Report makes clear that first - if not all - commercial use is attributable to Defendant. (R&R, 28.) The record unequivocally demonstrates that "invitations, advertising materials, [and] sponsorship letters" connected MLAS to Surrey, "business relationships essential to producing [the MLAS]" were between Surrey and third parties, and even "solicitations and thank you letters [sent] on Surrey letterhead" and signed by Ms. Gemmer, as chairperson of the event, constituted commercial use by Surrey. (R&R, 28) The court reasonably concluded that "the 'public face' of [the MLAS] connected the event to Surrey Services for Seniors" and not the Gemmers. (R&R, 28) Therefore, while it is undisputed that Mrs. Gemmer in fact used the MLAS mark while volunteering in her role as chairperson of the MLAS committee, that use constituted commercial activity properly attributed to Surrey.

(4) Objection to reliance on the "*SOS*" case: Overruled as moot.
As previously discussed, the "related companies" doctrine is not applicable in this case. In yet another footnote, the Report remarks, "The Ninth Circuit decision in *Secular Organizations for Sobriety, Inc. v. Ulrich*, 213 F.3d 1125 (2000) ('SOS'), appears to most closely parallel the situation present in this case" and that even if the "related companies" doctrine applied, it imposed

(continued...)

(1) With the exception of Paragraphs 65, 118, and 126 (as more specifically set forth below), the Report and Recommendation is APPROVED and ADOPTED;

(2) Plaintiffs' Motion for Preliminary Injunction is DENIED and Defendant's Motion for Preliminary Injunction is GRANTED; and,

(3) Plaintiffs are enjoined from using the name "The Main Line Antiques Show" or any other confusingly similar name or mark in the production of any antique show, in advertisements or invitations for any antique show, in solicitations for any antique show, in entering into contracts related to the production of any antiques show, in any domain names, or in any application in the United States Patent and Trademark Office.

BY THE COURT:

/s/ C. Darnell Jones, II    J.

---

[1] (...continued)
an additional requirement of a "substantial relationship" between the parties." (R&R, n. 4.) As earlier noted at length, the "related companies" doctrine is not applicable, given the factual record as it exists in this case. Therefore, whether the "SOS" case closely parallels this case or whether the doctrine in fact imposes a "substantial relationship" requirement, is immaterial to the present outcome. Furthermore, a reading of the Report in its entirety and in context, clearly rejects application of the "related companies" doctrine, therefore conclusions about the substantive requirements of that doctrine do not affect the ultimate conclusion reached.